# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

209 JAX OWNER, LLC; MONROE
ACQUISITION, LLC; BELL
ACQUISITION, LLC; RANDOLPH
ACQUISITION, LLC; and ATRIUM
ACQUISITION, LLC,

        Plaintiffs

        Case No. 2014-_____

v.

        Hon._____

PREFERRED BUILDING SERVICES,
LLC, a BELFOR COMPANY; DAVID
LAUTENBACH; and ARIF "BILLY"
SULEJMANOVSKA

        Defendant

_____

NEUMAN ANDERSON, P.C.
Kenneth F. Neuman (P39429)
Stephen T. McKenney (P65673)
401 South Old Woodward Ave., Ste. 460
Birmingham, MI 48009
Phone: 248.594.5252
kneuman@neumananderson.com
smckenney@neumananderson.com
Attorneys for Plaintiff
_____

## COMPLAINT

        Plaintiffs 209 Jax Owner, LLC; Monroe Acquisition, LLC; Bell Acquisition,

LLC; Randolph Acquisition, LLC; and Atrium Acquisition, LLC, for their

complaint against Defendant Preferred Building Services, LLC state:

## PARTIES JURISDICTION AND VENUE

1.  Plaintiff 209 Jax, LLC is a limited liability company.

2.  Plaintiff Monroe Acquisition, LLC is a limited liability company.

3.  Plaintiff Bell Acquisition, LLC is a limited liability company.

4.  Plaintiff Randolph Acquisition, LLC is a limited liability company.

5.  Plaintiff Atrium Acquisition, LLC is a limited liability company. (Collectively, 209 Jax, LLC, Monroe Acquisition, LLC, Bell Acquisition, LLC, Randolph Acquisition, LLC and Atrium Acquisition, LLC are "Plaintiffs")

6.  Defendant Preferred Building Services, LLC ("PBS") is a limited liability company which conducts business in the state of Michigan.  Plaintiff is, on information and belief, owned or controlled by Belfor Company.

7.  Defendant David Lautenbach ("Lautenbach") is an individual citizen of Michigan.  Lautenbach transacted business in Michigan as described in this Complaint and caused acts to be done and consequences to occur within Michigan, which resulted in the actions for tort described in this Complaint.

8.  Defendant Arif "Billy" Sulejmanovska ("Sulejmanovska") is an individual citizen of Illinois.  (Collectively, PBS, Lautenbach and Sulejmanovska are "Defendants").  Sulejmanovska transacted business in Michigan as

2

described in this Complaint and caused acts to be done and consequences to occur within Michigan, which resulted in the actions for tort described in this Complaint.

9. Plaintiffs' claims arise under the Constitution, laws or treaties of the United States, therefore, this Court has jurisdiction over the subject matter of this action consistent with 28 U.S.C. § 1331.

10. Defendant PBS is a limited liability company organized under the laws of the state of Michigan, with a registered office located in the state of Michigan. Defendants are subject to the jurisdiction of this Court, therefore, consistent with 28 U.S.C. 1391(c)(2), this Court is a proper venue for this action.

## GENERAL ALLEGATIONS

11. Plaintiffs incorporate all previous paragraphs by reference.

12. Plaintiffs are single-asset limited liability companies that own commercial office buildings located in Illinois.

13. Plaintiff 209 Jax Owner, LLC is the owner of a commercial office building commonly known as: 209 West Jackson St., Chicago, IL.

14. Plaintiff Monroe Acquisition, LLC was, at the time of the events described in this Complaint, the owner of a commercial office building commonly known as: 200 West Monroe Ave., Chicago, IL.

3

15.   Plaintiff Bell Acquisition, LLC is the owner of a commercial office building commonly known as: 79 West Monroe Ave., Chicago, IL.

16.   Plaintiff Randolph Acquisition, LLC is the owner of a commercial office building commonly known as: 205 West Randolph St., Chicago, IL.

17.   Plaintiff Atrium Acquisition, LLC is the owner of a commercial office building commonly known as: 216 West Jackson St., Chicago, IL.

18.   Each of the Plaintiffs entered into separate contacts with PBS, in which PBS agreed to provide janitorial and other building maintenance services to Plaintiffs, for each of their respective buildings in exchange for payment by Plaintiffs to PBS.

19.   The contracts between Plaintiffs and PBS were "cost-plus" contracts meaning that PBS's employees to perform the actual work at Plaintiffs' buildings; PBS would take costs associated with these employees, mark them up ten percent, then invoice Plaintiffs for payment.

20.   PBS exercised extraordinarily lax supervision of its on-site Chicago employees.   PBS's supervisors were not on-site and PBS failed to conduct background checks of its on-site employees.

21.   At all times relevant to the facts stated in this Complaint, Lautenbach served as Vice President of Farbman Group.

22. Prior to terminating Lautenbach's association with Farbman Group in 2014, Lautenbach had worked with Farbman Group for over nineteen years.

23. Farbman Group was the manager of all of the properties owned by the Plaintiffs.

24. As the Vice-President of Farbman Group, Lautenbach had authority to request and approve payment of invoices on behalf of Plaintiffs, including invoices received from PBS.

### A.    The "Inflated And Fabricated Third-Party Invoice Scheme"

25. Beginning in or about June 2012, Defendants concocted a scheme to defraud Plaintiffs, which involved the inflation and fabrication of invoices for work allegedly contracted through PBS; the inflated and fabricated invoices were sent by Defendants from Illinois to Michigan by U.S. Mail and/or electronic communication (specifically including e-mail, fax and other electronic billing software).

26. Beginning in or around June 2012, Lautenbach and Sulejmanovska agreed to a plan in which they would solicit bids/quotes from third party vendors, through PBS, for certain services to be performed at the Plaintiffs' office buildings.

5

27.   The third party vendors involved in this scheme include, but may not be limited to: Agim Father & Sons Painting, Inc.; Glass Tree, Inc.; and NS Builders, Inc.

28.   Lautenbach and Sulejmanovska took the quotes that they received from third party vendors (the "Original Quotes") and then instructed the third-party vendors to inflate the quotes and resubmit them (the "Inflated/Fabricated Quotes").

29.   Lautenbach and Sulejmanovska would use the PBS invoicing system (or in some instances, they would bypass the PBS invoicing system and invoice Plaintiffs directly) to invoice the Plaintiffs for the Inflated Quotes, which Lautenbach and Sulejmanovska established (the "Inflated/Fabricated Invoices").

30.   Sulejmanovska and PBS would send Inflated/Fabricated Invoices to Plaintiffs in Michigan, by U.S. Mail and/or electronic communication (including e-mail, fax and other electronic billing software).

31.   In the Inflated/Fabricated Invoices, Defendants represented that:

   a.   the amount they were charging Plaintiffs was the amount that the third-party vendors had quoted

   b.   the third-party vendors would be paid the amounts stated in the Inflated/Fabricated Invoices; and

6

c. the work described in the Inflated/Fabricated Invoice was actually performed.

32. The Inflated/Fabricated Invoices falsely stated that the third-party vendors were seeking payment in excess of what the third-party vendors were actually claiming for their work; in some of the Inflated Fabricated Invoices, work was described as being performed by the third-party vendors when it was not actually performed.

33. Lautenbach would authorize Plaintiffs to pay the Inflated/Fabricated Invoices; Plaintiffs would then send checks to PBS.

34. Plaintiffs relied on the statements contained in the Inflated/Fabricated Invoices by making payments as requested in the invoices to PBS.

35. Each of the individual Plaintiffs separately paid for the invoices sent to that Plaintiff for work on the building that the particular Plaintiff owned.

36. For the Inflated/Fabricated Invoices that were processed through the PBS invoicing system, after PBS received the payment from Plaintiffs, PBS would pay the third party vendors the amount of money quoted by the third party vendors in the Inflated/Fabricated Quotes, and retain its 10% based on the Inflated/Fabricated Quotes even though this procedure was not consistent with the terms of the PBS/Plaintiffs' contracts.

7

37.   After the third-party vendors received payment (either from PBS or from Plaintiffs directly), the third-party vendors would retain the money that corresponded with the Original Quotes, plus a small "kickback" and distribute the remaining money to Sulejmanovska and/or Lautenbach.

38.   Plaintiffs were directly and proximately injured by their reliance on the false statements of Defendants because Plaintiffs:

   a.   paid more for services of third-party vendors than was actually requested; and

   b.   paid for work that was not performed.

**B.    The "Inflated And Fabricated Hours Scheme"**

39.   Beginning in or about June 2012, Defendants concocted a scheme to defraud Plaintiffs, which involved the inflation and fabrication of hours worked by certain PBS contractors; Defendants sent the invoices for the inflated and fabricated hours from Illinois to Michigan by U.S. Mail and/or electronic communication (specifically including e-mail, fax and/or other electronic billing software).

40.   PBS did not use the time card machines on site at the buildings; instead, PBS used handwritten timesheets to records its employees' time.

41.  Beginning in or around June 2012, Lautenbach and Sulejmanovska agreed to a plan in which they would create false time sheets for independent contractors hired by PBS to work in Plaintiff's building (the "Independent Contractors") providing cleaning, janitorial and other building maintenance services.

42.  The PBS Independent Contractors involved in this scheme include, but may not be limited to: Stanislawa Jasien; Anthony Liace; Heriberto Navarez; Nermina Selimanovic; Arif "Billy" Sulejmanovska (defendant in this case); and Bedrrije Sulejmanovska (defendant Sulejmanovska's wife).  On information and belief, the Site Employees were relatives of Sulejmanovska or trusted associates of Sulejmanovska's.

43.  Lautenbach and Sulejmanovska took the timesheets that the Site Employees submitted to Sulejmanovska (in his role as agent and site supervisor for PBS) and then added hours to those that were actually reported as worked by the Site Employees (the "Inflated/Fabricated Hours").

44.  Lautenbach and Sulejmanovska would use the PBS invoicing system to invoice the Plaintiffs for the Inflated/Fabricated Hours, which Lautenbach and Sulejmanovska had marked up.

45.	Sulejmanovska and PBS would send Inflated/Fabricated Hours in written invoices and work orders to Plaintiffs in Michigan, by electronic communication.

46.	In the written invoices and work orders that contained the Inflated/Fabricated Hours, Defendants represented that the hours listed in each invoice and work order were actually worked by the Site Employees.

47.	The written invoices and work orders that contained the Inflated/Fabricated Hours falsely stated that the Site Employees worked more hours that what the Independent Contractors actually worked.

48.	Lautenbach would authorize Plaintiffs to pay the written invoices and work orders that contained the Inflated/Fabricated Hours; Plaintiffs would then send checks to PBS.

49.	Plaintiffs relied on the statements contained in the written invoices and work orders that contained the Inflated/Fabricated Hours by making payments to PBS as requested in the invoices and work orders.

50.	After PBS received the payment from Plaintiffs, PBS would pay the Site Employees the wages due based on the Inflated/Fabricated Hours and retain the mark-up on the Inflated/Fabricated Hours.

51.  After the Site Employees received the wage payments based on the Fabricated/Inflated Hours, they would retain all of the wage payment for the hours they actually worked; and a portion of the payment for the hours that were inflated or fabricated as a "kickback."

52.  The Site Employees would pay the remainder of the wage payment for the Inflated/Fabricated Hours to Lautenbach and/or Sulejmanovska, who would divide that money between them.

53.  Plaintiffs were directly and proximately injured by their reliance on the false statements of Defendants because Plaintiffs:

  a.  paid more for services of Site Employees than was actually required; and

  b.  paid for work that was not performed.

**C.   The "Inflated Wage Scheme"**

54.  Beginning in or about June 2012, Defendants concocted a scheme to defraud Plaintiffs, which involved the inflation and fabrication of wages paid to certain PBS contractors; Defendants sent the invoices for the inflated and fabricated wages from Illinois to Michigan by electronic communication (specifically including e-mail, fax and/or other electronic billing software).

11

55.   Beginning in or around June 2012, Lautenbach and Sulejmanovska agreed to a plan in which they would create false wage and hour reports for the Site Employees for services allegedly provided at Plaintiffs' buildings.

56.   Defendants initiated the Inflated Wage Scheme when Plaintiffs raised concerns about the number of overtime hours worked (which was a consequence of the Inflated and Fabricated Hours Scheme).

57.   The PBS Site Employees involved in this scheme include, but may not be limited to: Arif "Billy" Sulejmanovska (defendant in this case).

58.   Lautenbach and Sulejmanovska submitted work orders, signed by Sulejmanovska in which Site Employees were listed as having worked certain hours on certain projects and then inflated the wages earned by the Site Employees for those projects (the "Inflated Wages").

59.   By way of example (and not limitation), Sulejmanovska's normal wage rate for work he performed at Plaintiffs' properties was $16.00 per hour; but on some invoices for work performed by Sulejmanovska, his wage rate was increased to $40.00 per hour.

60.   Lautenbach and Sulejmanovska would use the PBS invoicing system to invoice the Plaintiffs for the Inflated Wages, which Lautenbach and Sulejmanovska had marked up.

12

61.   Sulejmanovska and PBS would send written invoices and work orders including the Inflated Wages to Plaintiffs in Michigan, by electronic communication.

62.   In the written invoices and work orders that contained the Inflated Wages, Defendants represented that the wages listed in each invoice and work order were the contractually or lawfully-required wage owed to the Independent Contractors.

63.   The written invoices and work orders that contained the Inflated Wages falsely stated that the Site Employees were owed a higher wage than what the Site Employees actually were owed.

64.   Lautenbach would authorize Plaintiffs to pay the written invoices and work orders that contained the Inflated Wages; Plaintiffs would then send checks to PBS.

65.   Plaintiffs relied on the statements contained in the written invoices and work orders that contained the Inflated Wages by making payments to PBS, as requested in the invoices.

66.   After PBS received the payment from Plaintiffs, PBS would pay the Site Employees the wages due based on the Inflated Wages and retain the mark-up on the Inflated Wages.

67. After the Site Employees received the wage payments based on the Inflated Wages, they would retain all of the wage payment for the hours they actually worked.

68. The Site Employees would pay the remainder of the wage payment for the Inflated Wages to Lautenbach and/or Sulejmanovska, who would divide that money between them.

69. Plaintiffs were directly and proximately injured by their reliance on the false statements of Defendants because Plaintiffs paid more for services of Site Employees than was contractually required.

**D.    The "Double-Billing Scheme."**

70. Beginning in or about June 2012, Defendants concocted a scheme to defraud Plaintiffs, which involved the invoicing Plaintiffs for services performed by Sulejmanovska as both an agent of PBS and as an independent contractor for third-party contractor Glass Tree, Inc "Glass Tree"); the invoices claimed that Sulejmanovska worked the same number of hours, on the same day, on the same project as both an agent of PBS and as an agent of Glass Tree.

71. On information and belief, Glass Tree is wholly owned or controlled by Sulejmanovska.

14

72.   Defendants sent the invoices for Sulejmanovska's work as an agent of PBS and for Sulejmanovska's work as an agent of Glass Tree from Illinois to Michigan by electronic communication (specifically including e-mail, fax and/or other electronic billing software).

73.   Lautenbach and Sulejmanovska submitted work orders, signed by Sulejmanovska in which Sulejmanovska claimed that he worked, as an agent of PBS, on a specific project for a specific number of hours on a specific day.

74.   Contemporaneously, Lautenbach and Sulejmanovska submitted invoices from Glass Tree, in which Sulejmanovska claimed that he worked, as an agent of Glass Tree, on a the exact same project for the exact same number of hours on the exact same day (theses two separate sets of invoices, the ones for Sulejmanovska's work as PBS's agent; and the ones for Sulejmanovska's work as Glass Tree's agent for the same project are the "Duplicate Invoices").

75.   Lautenbach and Sulejmanovska would use the PBS invoicing system to invoice the Plaintiffs for the hours worked by Sulejmanovska as an agent of PBS; and the hours worked by Sulejmanovska as an agent of Glass Tree.

15

76.   Sulejmanovska and PBS would send written invoices and work orders including the Duplicate Invoices for Sulejmanovska's alleged work to Plaintiffs in Michigan, by electronic communication.

77.   In the Duplicate Invoices, Defendants represented that the services were performed by two separate people, when in fact, Sulejmanovska was the only individual performing the services.

78.   Lautenbach would authorize Plaintiffs to pay both of the Duplicate Invoices and work orders that contained the Duplicate Invoices; Plaintiffs would then send checks to PBS.

79.   Plaintiffs relied on the statements contained in the Duplicate Invoices and work orders that contained the Duplicate Invoices by making payments to PBS, as requested in the Duplicate Invoices.

80.   After PBS received the payment from Plaintiffs, PBS would:

   a.   pay Sulejmanovska the wages due based on the his work as PBS's agent;

   b.   pay Glass Tree for the work Sulejmanovska did as Glass Tree's agent for the exact same project;  and

   c.   retain the 10% mark-up on the both of the Duplicate Invoices.

81.   After Sulejmanovska and Glass Tree received the wage payments based on the Duplicate Invoices, Sulejmanovska would retain all of the wage payment for the one set of hours he actually worked.

82.   Lautenbach and Sulejmanovska would divide the duplicate wages paid between them.

83.   Plaintiffs were directly and proximately injured by their reliance on the false statements of Defendants because Plaintiffs paid more for services of PBS, Sulejmanovska and Glass Tree than was contractually required.

## COUNT I – CIVIL RICO
## VIOLATION OF 18 U.S.C. § 1962(b) and (c)

84.   Plaintiffs incorporate all previous paragraphs by reference.

85.   Defendants, through the Inflated and Fabricated Invoice Scheme, the Inflated and Fabricated Hours Scheme, the Inflated Wage Scheme and the Double-Billing Scheme, each described above, acquired or maintained, through a pattern of racketeering activity, an interest in or control of an enterprise engaged in activities which affect interstate commerce.

86.   Defendants' pattern of racketeering activity included the following predicate acts:  mail fraud, in violation of 18 U.S.C. § 1341; wire fraud in

violation of 18 U.S.C. § 1343; and embezzlement in violation of Mich. Comp. Laws Ann. § 750.174.

87.   Through the Inflated and Fabricated Invoice Scheme, the Inflated and Fabricated Hours Scheme, the Inflated Wage Scheme and the Double-Billing Scheme, each described above, Defendants concocted four separate and interrelated schemes to defraud Plaintiffs.

88.   Defendants used the Inflated and Fabricated Invoice Scheme, the Inflated and Fabricated Hours Scheme, the Inflated Wage Scheme and the Double-Billing Scheme continuously and systematically as part of a concerted effort and pattern to defraud Plaintiffs and enrich themselves.

89.   In these four separate and interrelated schemes, Defendants made specific written misrepresentations to Plaintiffs about:

   a.  invoices for third party contractors that were inflated as to the amounts paid to the contractors and/or entirely fabricated as to work allegedly performed by third party contractors, which was never performed;

   b.  invoices and work orders for hours allegedly worked by Site Employees, which Defendants inflated and fabricated with excess hours that were never, in fact, worked by the Site Employees;

18

    c.  invoices and work orders for wage rates allegedly paid to Site Employees, which were untrue because the wages actually owed to the Site Employees for overtime worked were substantially less than what Defendants represented was owed in the work orders and invoices; and

    d.  how many people actually worked on specific projects invoiced to Plaintiffs by invoicing Sulejmanovska's time for the exact same work on the exact same project as both an agent of PBS and as an agent of independent contractor Glass Tree.

90. Defendants sent Plaintiffs the invoices and work orders with the false information about monies owed to third party contractors; hours worked by Site Employees; wages owed to Site Employees; and how many employees performed work; with the intention that Plaintiffs would rely upon the misrepresentations and pay the inflated amounts claimed by Defendants to Defendants.

91. Plaintiffs reasonably relied on defendant Lautenbach to approve appropriate invoices and relied that when Lautenbach approved the invoices it was because the work had been performed and charged in the appropriate manner.

92.    Defendants, as an integral part of the scheme to defraud, relied upon PBS's ability to invoice Plaintiffs as a part of the existing contractual relationship between Plaintiffs and PBS to achieve their goal of continuously and systematically defrauding Plaintiffs through the Inflated and Fabricated Invoices Scheme, the Inflated and Fabricated Hours Scheme, the Inflated Wages Scheme and the Double-Billing Scheme.

93.    Defendants, as an integral part of the scheme to defraud, relied upon Lautenbach's position of responsibility with Plaintiffs to achieve their goal of continuously and systematically defrauding Plaintiffs through the Inflated and Fabricated Invoices Scheme, the Inflated and Fabricated Hours Scheme, the Inflated Wages Scheme and the Double-Billing Scheme.

94.    Defendants, as an integral part of the scheme to defraud, relied upon Sulejmanovska's position of responsibility with PBS, Sulejmanovska's relationship with Glass Tree and the other third-party contractors and Sulejmanovska's relationship with the Site Employees to achieve their goal of continuously and systematically defrauding Plaintiffs through the Inflated and Fabricated Invoices Scheme, the Inflated and Fabricated

Hours Scheme, the Inflated Wages Scheme and the Double-Billing Scheme.

95.   Defendants' scheme successfully induced Plaintiffs to pay millions of dollars in overpayments for work not performed at wage rates not agreed to over the course of time at least between June 2012 and December 2013.

96.   Through the Inflated and Fabricated Invoice Scheme, the Inflated and Fabricated Hours Scheme, the Inflated Wages Scheme and the Double-Billing Scheme, each described above, Defendants used the mails as an indispensible part of the scheme to defraud Plaintiffs by receiving payments based on the fraudulent invoices through the mails.

97.   Through the Inflated and Fabricated Invoice Scheme, the Inflated and Fabricated Hours Scheme, the Inflated Wage Scheme and the Double-Billing Scheme, each described above, Defendants used the electronic communications including e-mails, facsimile messages and computer software programs operated through electronic interstate communication, as an indispensible part of the scheme to defraud Plaintiffs by sending the fraudulent invoices to Plaintiffs by e-mail, fax and/or other electronic billing software.

98. Defendants' Inflated and Fabricated Invoice Scheme, Inflated and Fabricated Hours Scheme, Inflated Wage Scheme and Double-Billing Scheme, as described above, affected interstate commerce because they specifically preyed upon Michigan companies' real estate holdings in Illinois, which were under the close supervision of and subject to the manipulation of Defendants in Illinois, and all of the communications about payment of invoices were sent to Michigan.

99. Defendants' fraudulent statements originated with false time reports and Original Invoices that were created in Illinois; then sent to Michigan for reconfiguration into standard PBS invoices; and then sent to Plaintiffs for payment in Michigan.

100. The excess, fraudulently obtained funds generated by Defendants' schemes were split between PBS in Michigan and Lautenbach and Sulejmanovska in Illinois.

101. The money that Plaintiffs paid to Defendants under the guise of the fraudulent invoices, timesheets and work orders, belonged to Plaintiffs.

102. PBS and Sulejmanovska (as PBS's agent in charge of services performed for Plaintiffs' buildings in Chicago) had a relationship of trust with Plaintiffs because PBS and Sulejmanovska served as Plaintiffs' agent in

arranging for services to be provided by third-party contractors and the Site Employees for the benefit of Plaintiffs' buildings.

103. Lautenbach had a relationship of trust with Plaintiffs because Lautenbach was a vice president and agent of Plaintiffs' manager, the Farbman Group.

104. On the basis of the relationship of trust, Plaintiffs paid the invoices to Defendant PBS believing the statements on the invoices about the services provided, the cost of services provided, the hours worked and the wage rate for the hours worked were all true and accurate.

105. Defendants collected all of the amounts claimed under the fraudulent invoices, paid the third-party contractors and Site Employees, and dishonestly, and with ill intent, retained the difference between the legitimate charges and the fraudulent overcharges for themselves; did not tell Plaintiffs about the overcharges; and secreted the overcharges and their retention of the overcharges from Plaintiffs.

106. Plaintiffs did not consent to the fraudulent overcharges or to Defendants' retention of the fraudulent overcharges.

107. In devising and executing the Inflated and Fabricated Invoice Scheme, the Inflated and Fabricated Hours Scheme, the Inflated Wage Scheme

and the Double-Billing Scheme, Defendants intended to cheat and defraud Plaintiffs.

108. The Defendants created and acquired an interest in an enterprise. The enterprise was the agreement between Defendants to create fraudulent third party contractor invoices; fraudulent time sheets and fraudulent wage reports  and to use the PBS invoicing system to fraudulently invoice Plaintiffs for these inflated and fabricated invoices.

109. The Defendants' agreement and enterprise was an on-going, continuous and systematic organization that had as its objective the persistent defrauding of Plaintiffs through the submission of false, fraudulent inflated and fabricated invoices.

110. Defendants operated as a continuing unit in carrying out the Inflated and Fabricated Invoice Scheme, the Inflated and Fabricated Hours Scheme, the Inflated Hours Scheme and the Double-Billing Scheme. All three of the Defendants were necessary and indispensible parties to the enterprise and its fraudulent goals. Without the continuing action of each member of the enterprise, the enterprise would have failed to achieve its unlawful goals.

111. Defendants' enterprise needed:

a.  an agent working on behalf of PBS to create the fraudulent timesheets and work orders (Sulejmanovska);

b.  the service company charged with contracting for and performing the work and collecting payment for the work, to send the fraudulent invoices through the normal course of business (PBS); and

c.  an agent working on behalf of Plaintiffs to approve the invoices for payment by Plaintiffs (Lautenbach).

The enterprise would have failed without any one of these three legs.

112.  Plaintiffs paid the invoices in reliance on the accuracy and honesty of Defendants' statements in the invoices.

113.  But for the fraudulent statements in the invoices described above, Plaintiffs would not have paid, and Defendants would not have obtained or retained, the difference between the fraudulent overcharges and the actual charges for actual services performed.

114.  But for the fraudulent statements in the invoices described above, Plaintiffs would have paid only for the actual services performed by the third party contractors and Site Employees at the actual rates and wages charged by the third party contractors and Independent

Contractors, plus PBS's contractual 10% of the charges for the actual work performed at the actual rates owed.

115. The operation of the enterprise by Defendants was the proximate cause of the Plaintiffs' economic damage because the enterprise created, made and maintained the fraudulent statements and collected on the excess charges and induced Plaintiffs' reliance to make the payments to Defendants.

WHEREFORE Plaintiffs request that this Court enter judgment in their favor against Defendants, jointly and severally; award any and all relief as provided by 18 U.S.C. § 1964; and award any other relief that this Court deems appropriate, just and equitable.

**COUNT II - CIVIL RICO CONSPIRACY**
**VIOLATION OF 18 U.S.C. § 1962(d)**

116. Plaintiffs incorporate all previous paragraphs by reference.

117. PBS, Lautenbach and Sulejmanovska made an agreement to form the enterprise, control the enterprise and use the enterprise to conduct a pattern of racketeering activity (though the operation of the Inflated and Fabricated Invoice Scheme, the Inflated and Fabricated Hours Scheme, the Inflated Wages Scheme and the Double-Billing Scheme described above) in violation of 18 U.S.C. § 1962(b) and(c).

118.   Defendants' agreement violated 18 U.S.C. § 1962(b), (c) and (d).

119.   Plaintiffs were injured as a direct and proximate result of the agreement and the violation of 18 U.S.C. § 1962(b), (c) and (d).

WHEREFORE Plaintiffs request that this Court enter judgment in their favor, against Defendants, jointly and severally; award any and all relief as provided by 18 U.S.C. § 1964; and award any other relief that this Court deems appropriate, just and equitable.

## COUNT III – FRAUDULENT MISREPRESENTATION

120.   Plaintiffs incorporate all previous paragraphs by reference.

121.   Defendants made representations to Plaintiffs about:

   a.   certain services performed by third party contractors and the cost of those services;

   b.   the number of hours worked by Site Employees; and

   c.   the wage rates paid to the Site Employees.

122.   Defendants made these representations in written invoices that were sent by PBS to Plaintiffs, via electronic communication, between, at least June 2012 and December 2013.

123.   Defendants' representations were not true when they were made; the services performed by third party contractors were, in some instances, not ever performed; the amounts owed to third party contractors were

27

overstated by Defendants; the number of hours that the Defendants stated that the Site Employees worked were higher than the actual number of hours the Site Employees worked; the wage rates Defendants stated that they owed to the Site Employees were higher than the wage rates Defendants actually owed to the Site Employees; and for certain invoices wages were not owed to Sulejmanovska as both an agent of PBS and as an agent of Glass Tree for the same project.

124. Defendants made the representations to Plaintiffs with the intent that Plaintiffs would rely on the representations and pay Defendants more than what Plaintiffs actually owed for the items described in the invoices.

125. Plaintiffs relied on the statements contained in the invoices generated by Defendants and made the payments requested in the invoices believing the statements in the invoices to be true and accurate.

126. As a direct and proximate result of Plaintiffs' detrimental reliance on the statements of Defendants, Plaintiffs suffered financial injury in the amount of the overpayments they made based on the misrepresentations; and attorney fees and costs incurred in seeking redress for these damages.

WHEREFORE, Plaintiffs request that this Court enter judgment in favor of Plaintiffs and against Defendants, jointly and severally; award Plaintiffs their damages; award Plaintiffs exemplary damages; award Plaintiffs their interest, costs and attorney fees; and award Plaintiffs any other relief that this Court deems appropriate, just and equitable.

## COUNT IV – CONVERSION
## VIOLATION OF MICH. COMP. LAWS ANN. § 600.2919a

127.   Plaintiff incorporates all previous paragraphs by reference.

128.   Defendants obtained control and dominion over money belonging to Plaintiffs by false pretenses, through the Inflated and Fabricated Invoices Scheme; the Inflated and Fabricated Hours Scheme; the Inflated Wages Scheme and the Double-Billing Scheme described above, where Plaintiffs did not commit to a legitimate debtor-creditor relationship.

129.   Defendants have an obligation to return the money that they stole from Plaintiffs because Defendants did not legitimately earn this money.

130.   Defendants have retained this money inconsistent with Plaintiffs' rights to the money.

131.   Defendants have converted this money to their own use.

132.   Defendants' conversion of Plaintiffs' money has directly and proximately caused Plaintiffs financial injury.

WHEREFORE, Plaintiffs request that this Court enter judgment in their favor, against Defendants, jointly and severally; award any and all relief as provided by Mich. Comp. Laws Ann. § 600.2919a; and award any other relief that this Court deems appropriate, just and equitable.

### COUNT V - EMBEZZLEMENT

133.  Plaintiff incorporates all previous paragraphs by reference.

134.  The money that Plaintiffs paid to Defendants under the guise of the fraudulent invoices, timesheets and work orders, belonged to Plaintiffs.

135.  PBS and Sulejmanovska (as PBS's agent in charge of services provided for Plaintiffs' buildings in Chicago) had a relationship of trust with Plaintiffs because PBS and Sulejmanovska served as Plaintiffs' agent in arranging for services to be provided by third party contractors and the Site Employees for the benefit of Plaintiffs' buildings.

136.  Lautenbach had a relationship of trust with Plaintiffs because Lautenbach was a vice president and agent of Plaintiffs' manager, the Farbman Group.

137.  On the basis of the relationship of trust, Plaintiffs paid the invoices to defendant PBS believing the statements on the invoices about the services provided, the cost of services provided, the hours worked and the wage rate for the hours worked were all true and accurate.

138. Defendants collected all of the amounts claimed under the fraudulent invoices, paid the third-party contractors and Independent Contractors, and dishonestly, and with ill intent, retained the difference between the legitimate charges and the fraudulent overcharges for themselves; did not tell Plaintiffs about the overcharges; and secreted the overcharges and their retention of the overcharges from Plaintiffs.

139. Plaintiffs did not consent to the fraudulent overcharges or to Defendants' retention of the fraudulent overcharges.

140. In devising and executing the Inflated and Fabricated Invoice Scheme, the Inflated and Fabricated Hours Scheme, the Inflated Wages Scheme and the Double-Billing Scheme, Defendants intended to cheat and defraud Plaintiffs.

WHEREFORE, Plaintiffs request that this Court enter judgment in favor of Plaintiffs against Defendants, jointly and severally; award Plaintiffs their damages; award Plaintiffs exemplary damages; award Plaintiffs their interest, costs and attorney fees; and award Plaintiffs any other relief that this Court deems appropriate, Just and equitable.

## COUNT VI – CONSPIRACY

141. Plaintiff incorporates all previous paragraphs by reference.

142. By agreeing to undertake, engaging in and/or allowing the actions

31

described in this Complaint, Defendants have engaged in concerted actions in an effort to defraud and steal from Plaintiffs.

143.  Defendants engaged in this concerted action to accomplish an unlawful purpose or a lawful purpose by unlawful means, including the enrichment of themselves at Plaintiff's expense *via* their fraudulent conduct, conversion and/or embezzlement.

144.  As a direct and proximate result of Defendants' actions, Plaintiff has suffered financial injury.

WHEREFORE, Plaintiffs request that this Court enter judgment in favor of Plaintiffs against Defendants, jointly and severally; award Plaintiffs their damages; award Plaintiffs exemplary damages; award Plaintiffs their interest, costs and attorney fees; and award Plaintiffs any other relief that this Court deems appropriate, just and equitable.

## COUNT VII – BREACH OF CONTRACT

145.  Plaintiffs incorporate all previous paragraphs by reference.

146.  Plaintiffs each had separate written agreements with PBS in which PBS agreed to provide janitorial services to Plaintiffs in exchange for payment from Plaintiffs to PBS.

147.  The written agreements were enforceable contracts.

148.  PBS breached their obligations under the contracts by engaging in the

facts described in the previous paragraphs in this complaint, which are specifically incorporated herein, and by engaging in other acts and omissions that may be determined during the course of discovery in this action.

149. PBS's breach of the agreements was the direct and proximate cause of financial injuries to Plaintiffs.

WHEREFORE, Plaintiffs request that this Court enter judgment in favor of Plaintiffs against PBS; award Plaintiffs their damages; award Plaintiffs their interest, costs and attorney fees; and award Plaintiffs any other relief that this Court deems appropriate, Just and equitable

Date: June 6, 2014                                    Respectfully submitted,

                                                      NEUMAN ANDERSON, P.C.

                                                        /s/ Kenneth F. Neuman
                                                      Kenneth F. Neuman (P39429)
                                                      kneuman@neumananderson.com
                                                      Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

209 JAX OWNER, LLC; MONROE
ACQUISITION, LLC; BELL
ACQUISITION, LLC; RANDOLPH
ACQUISITION, LLC; and ATRIUM
ACQUISITION, LLC,

       Plaintiffs

Case No. 2014-_____

v.

Hon._____

PREFERRED BUILDING SERVICES,
LLC, a BELFOR COMPANY; DAVID
LAUTENBACH; and ARIF "BILLY"
SULEJMANOVSKA

       Defendant
_____
NEUMAN ANDERSON, P.C.
Kenneth F. Neuman (P39429)
Stephen T. McKenney (P65673)
401 South Old Woodward Ave., Ste. 460
Birmingham, MI 48009
Phone: 248.594.5252
kneuman@neumananderson.com
smckenney@neumananderson.com
Attorneys for Plaintiff
_____

## **<u>JURY DEMAND</u>**

    Plaintiffs hereby demand a jury trial in this matter.

Date: June 6, 2014                              Respectfully submitted,

                                               NEUMAN ANDERSON, P.C.

                                               __/s/ Kenneth F. Neuman_____
                                               Kenneth F. Neuman (P39429)
                                               kneuman@neumananderson.com
                                               Attorneys for Plaintiffs